**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Dontay BANKS, Mario Dunlap, Michael Wills, Alton Mills, Robert Gaines, Monica Boguille, and Robert Shipp, Defendants–Appellants.**

Nos. 94–2785 through 94–2790, 94–2840.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 30, 1995.

Decided March 11, 1996.

Rehearing and Suggestion for Rehearing
En Banc Denied May 14, 1996.

Morris Pasqual, Barry Rand Elden, Chief of Appeals, R. Ryan Stoll (argued), Office of U.S. Atty., Criminal Appellate Div., Chicago, IL, for U.S.

Michael J. Falconer, James J. Cutrone (argued), Chicago, IL, for Dontay Banks.

Scott J. Frankel (argued), Frankel & Cohen, Chicago, IL, for Mario Dunlap.

Vickie Voukidis Blum, James Cutrone (argued), Michael J. Falconer, Chicago, IL, for Michael Wills.

William H. Theis (argued), Chicago, IL, for Alton D. Mills.

Michael G. Logan (argued), Chicago, IL, for Robert Gaines.

Standish E. Willis (argued), Chicago, IL, for Monica Boguille.

Roberta Samotny, James Cutrone (argued), Chicago, IL, for Robert Shipp.

Before CUMMINGS, RIPPLE and ROVNER, Circuit Judges.

RIPPLE, Circuit Judge.

The defendants in this matter were convicted, following a two-week jury trial, of various drug trafficking offenses. They received sentences ranging from 121 months to life imprisonment. In this consolidated appeal, the defendants challenge those convictions and sentences. For the reasons set forth in the following opinion, we affirm the judgments of the district court.

## I

## BACKGROUND

The defendants were convicted of their participation in a cocaine conspiracy which operated in Chicago from the fall of 1991 through May 1993.[1] The primary organizer

---

1. The defendants were charged in a twenty-six count superseding indictment. Count I of the indictment charged all of the defendants with conspiracy. 21 U.S.C. § 846. Counts VIII and

XX charged Dontay Banks with possession with intent to distribute cocaine, and Count XXV charged Alton Mills with possession of cocaine base with intent to distribute. 21 U.S.C.

of this conspiracy was Dontay Banks, who purchased powder cocaine from two suppliers[2] starting in September or November 1991. Most of the transactions were made directly between the suppliers and Mr. Banks, and at least three of the deliveries were made directly to Mr. Banks' home. The testimony of the suppliers indicated that these transactions often involved multi-kilogram quantities of cocaine powder and significant amounts of cash. Beginning in March 1993, Mr. Banks began to rely upon Alton Mills to handle the exchange of cocaine and cash with the suppliers. On one occasion in the spring of 1993, a sale of three kilograms of cocaine was made through Tosha Woods, a cousin of Mr. Banks, who testified on behalf of the government at trial pursuant to a grant of immunity.

After obtaining the powder cocaine from his suppliers, Mr. Banks and other members of the conspiracy used it to manufacture crack cocaine, then packaged the crack cocaine in smaller quantities for sale on the street. Tosha Woods and her father, James Woods (who testified for the government pursuant to a plea agreement), observed Mr. Banks "cooking" crack cocaine on the stove in his kitchen during 1992. They also testified that they observed Mr. Banks break the crack into smaller "rocks" for packaging, then weigh and bag it. The small plastic bags, which each sold for $10 on the street, were grouped into "packs" of thirty to thirty-five bags.

The sale of the individual bags of crack cocaine was carried out by street-level dealers. The sales were made around the clock, and the workers were organized into two shifts. One dealer who testified at trial for the government stated that she recalled once selling up to five or six "packs" in a day. Other evidence indicated that on a good day, the entire operation could generate up to $15,000 in sales. Mr. Mills, Robert Shipp, Mario Dunlap, and Michael Wills were each involved in overseeing aspects of the street

sales and in handling the cash proceeds. Robert Gaines worked as a dealer, primarily during the day shift. Ms. Boguille was involved in handling the cash produced from the sales—counting money, depositing it at the bank, and on one occasion picking up cash at another location at the request of Mr. Banks.

The jury returned a general verdict finding all the defendants guilty of the conspiracy count and each defendant guilty of various other substantive counts.[3] The defendants' post-trial motions seeking new trials were denied. The district court conducted a sentencing hearing on July 14, 1994. Mr. Banks, Mr. Shipp, Mr. Dunlap, and Mr. Mills were each sentenced to life imprisonment. Mr. Wills and Mr. Gaines were each sentenced to thirty years' imprisonment, and Ms. Boguille was sentenced to 121 months.

## II

## DISCUSSION

We shall address first the challenges presented by the defendants with respect to their convictions. Then we shall turn to the sentencing matters and examine them individually.

### A.

### The Guilt Phase of the Proceedings

1. *Sufficiency of the Evidence Claims*

We turn first to the sufficiency of evidence claims presented by various defendants. *See United States v. Douglas*, 874 F.2d 1145, 1150 (7th Cir.1989). A defendant who attacks the legal sufficiency of the evidence supporting a conviction shoulders a heavy burden. We review such claims with deference to the decision of the jury. We shall uphold the jury's conviction on this count if, after viewing the evidence in the light most favorable to the government, we determine that any rational trier of fact could

§ 841(a)(1). The remaining counts charged the defendants with use of a telephone to further narcotics offenses. 21 U.S.C. § 843(b).

**2.** Both of the suppliers testified at trial pursuant to a plea agreement with the government.

**3.** Mr. Banks and Ms. Boguille were acquitted of the Count III § 843(b) charge. Mr. Dunlap was acquitted of the § 843(b) violation charged in Count IV.

have found, beyond a reasonable doubt, the essential elements of the crime. *United States v. Penny*, 60 F.3d 1257, 1262 (7th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 931, 133 L.Ed.2d 858 (1996). A jury verdict may be overturned "only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Rosalez–Cortez*, 19 F.3d 1210, 1215 (7th Cir.1994) (quoting *United States v. Teague*, 956 F.2d 1427, 1433 (7th Cir.1992)).

#### a. Mr. Mills' conviction on Count XXV

Mr. Mills was convicted on Count XXV of the indictment which alleged that, on May 11, 1993, he possessed crack cocaine with the intent to distribute. 21 U.S.C. § 841(a)(1). The only evidence supporting his conviction, he argues, is the uncorroborated confession he gave following his arrest. According to testimony presented at trial, Mr. Mills confessed that on May 11, 1993, while trying to elude police, he threw from his car a gym bag containing a half kilogram of crack cocaine.

Mr. Mills submits that this uncorroborated evidence is insufficient to support his conviction on Count XXV. As he notes, the officers who chased him never saw anything thrown from the car, and the bag was never recovered. Furthermore, at the suppression hearing, Mr. Mills denied making the incriminating statement.

■ Although Mr. Mills correctly points out that a conviction may not rest on the uncorroborated confession of the accused, *Wong Sun v. United States*, 371 U.S. 471, 488–89, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963), the confession given by Mr. Mills was supported by adequate, corroborating evidence from which a rational jury could conclude that he was guilty of the crime charged in Count XXV. The prosecution introduced into evidence a phone conversation among Mr. Banks (who was incarcerated), Mr. Shipp and Ms. Boguille that had been recorded on May 11, 1993, the date of the crime alleged in Count XXV.[4] In that recording, Mr. Mills' codefendants can be heard discussing the circumstances surrounding his arrest and the whereabouts of "the candy"—a phrase that served as a code word for the crack cocaine sold by the conspiracy. Furthermore, the officer who arrested Mr. Mills on May 11 testified concerning Mr. Mills' reckless driving during the car chase; the government argued in its closing argument that Mr. Mills' driving, following only a minor traffic violation, indicated that he was attempting to elude the police and get rid of the drugs in his possession. With this corroboration, we cannot hold that the jury's verdict was unsupported by the evidence. Mr. Mills' conviction on Count XXV is upheld.

#### b. Ms. Boguille's conspiracy conviction

■ Ms. Boguille challenges her conviction, under Count I of the indictment, for conspiracy. She claims that the evidence was insufficient to show that she knowingly agreed to participate in the conspiracy. Ms. Boguille argues that the government's primary witness with respect to her involvement in the conspiracy was impeached and thus her testimony could not serve as the basis for the conviction on Count I.

We review Ms. Boguille's claim challenging the sufficiency of the evidence under the same deferential standard discussed above, and hold that the government presented sufficient evidence from which a rational jury could have found Ms. Boguille guilty of the conspiracy charge. Even if we accept Ms. Boguille's claim that the primary witness against her was impeached, the record does not show an absence of evidence on which to rest the jury's verdict. For example, Tosha Woods testified that, on one occasion, she and Ms. Boguille counted out cash in the bedroom of the home shared by Ms. Boguille and Mr. Banks. At Ms. Boguille's direction, Woods took money out of a plastic shopping bag and counted it into $100 stacks, which were then bound with rubber bands. Recorded telephone conversations also revealed Ms. Boguille's involvement in the conspiracy's operation. She was recorded while she checked on cooling crack cocaine for Mr. Banks and while she counted out thousand dollar stacks of money for him; she reported

---

**4.** Excerpts from that phone conversation are set out at footnote ten, *infra*.

to Mr. Banks the circumstances surrounding Mr. Mills' arrest and that he had "candy" with him during the chase; and on one occasion she picked up $20,000 for Mr. Banks. We hold that this evidence is sufficient to sustain the jury's verdict on this count.

### 2. Admission of Alton Mills' Confession

At trial, the government introduced as substantive evidence against Mr. Mills a statement that he made following his arrest. The statement, in a redacted form, was admitted at trial through the testimony of Officer Robert Grapenthien, who arrested Mr. Mills and conducted the post-arrest interview.[5] The testimony was accompanied by a limiting instruction admonishing the jury that the officer's statements were admissible as evidence against Mr. Mills alone. Mr. Mills challenges the admission of this testimony and claims that it should have been suppressed because his statement was given in violation of his *Miranda* rights. A hearing was held in response to Mr. Mills' motion to suppress the statement.

The evidence from the suppression hearing indicated that, pursuant to a warrant, Mr. Mills was arrested at approximately 5:30 a.m. on September 7, 1993. He was then placed in a squad car to be transported to the Federal Building in Chicago for questioning. While Mr. Mills was in the back seat of the squad car, one of the arresting officers read Mr. Mills his *Miranda* rights from a pre-printed form. He then asked Mr. Mills if he understood those rights, and Mr. Mills indicated that he did. The officer then read a waiver of those rights and asked Mr. Mills if he would be willing to sign the waiver. Mr. Mills refused to sign.[6] The officer noted the refusal on the waiver form.

At the suppression hearing, Mr. Mills testified that, during the drive to the Federal

Building, Officer Grapenthien told him that he was facing a potentially severe sentence—twenty years to life imprisonment. Officer Grapenthien also recalled the drive to the Federal Building in his testimony. He stated that he asked Mr. Mills if he knew the nicknames that his co-conspirators had for him; he told Mr. Mills that they had been referring to him as "Big Dumbo" behind his back.

At approximately 8:00 a.m., after Mr. Mills had been transported to the Federal Building and processed, he was interviewed. Mr. Mills testified that he was re-Mirandized by one of the interviewing officers and that he understood his *Miranda* rights. However, during the interview, Mr. Mills was not presented with the waiver form nor was he asked again whether he wished to sign it. During the interview, Officer Grapenthien showed Mr. Mills a transcript of a telephone conversation between his co-conspirators to confirm that they were calling him "Big Dumbo" in his absence. It was during this interview that Mr. Mills gave the incriminating statement.

The magistrate judge denied Mr. Mills' motion to suppress the statement, and the district court adopted the magistrate's recommendation and findings. Mr. Mills submits that the district court erred in denying his motion to suppress the statement. We review the denial of a motion to suppress for clear error. *United States v. Covarrubias*, 65 F.3d 1362, 1368 (7th Cir.1995). We give particular deference to the court that had the opportunity to hear the testimony and to observe the demeanor of the witnesses. *United States v. Vega*, 72 F.3d 507, 514 (7th Cir.1995).

Mr. Mills' first contention is that, at the time he initially refused to sign the waiv-

---

**5.** According to Officer Grapenthien's testimony, Mr. Mills told him that in May 1993 he had been arrested after he had made an illegal left turn and then had attempted to elude police. He confessed that the reason he tried to elude the police was that he had a half kilogram of crack cocaine in a gym bag with him. Mr. Mills stated that he tossed the gym bag out the window before the police finally stopped him.

Mr. Mills also described the scope of the crack cocaine operation in which he participated. He

described the procedures for transporting and delivering the drugs, the positions he held within the organization, the average daily sales, and the organization of the workers.

**6.** Specifically, Mr. Mills testified that he said to the officer: "Get the f— out of my face. I don't have nothing to say. I refuse to sign." Sent. Tr. 101.

er of rights form, he invoked his right to remain silent. He submits that the assertion of his right was not scrupulously honored and that he was subjected to further questioning in violation of his right to remain silent. Thus, because the interview was conducted following the invocation of this right, the statement was taken in violation of *Miranda* and ought to have been suppressed. The magistrate judge determined that the statement Mr. Mills made, when he was presented with the waiver form in the back of the squad car, did not amount to a clear assertion of his right to remain silent. Rather, the magistrate judge described his remarks as "the statement of somebody who is angry about what is happening to them, which makes a certain amount of sense under these circumstances." Sent. Tr. 140.

We believe that the magistrate judge's characterization of the statement was, on this record, a permissible one. Mr. Mills' response of "I don't got nothing to say," standing alone, could be construed as an invocation of his right to remain silent. Yet, when placed in the context of his other comments, the alternate interpretation—that it was merely an angry response to the form in front of him—is also possible. Given these two possible interpretations, the magistrate judge's determination that Mr. Mills' statement, when considered in context, was not a clear, unambiguous assertion of his right to remain silent cannot be disturbed by this court.

■ Earlier case law from this circuit took the view that, when it is unclear whether a suspect has invoked his *Miranda* rights, the police have the obligation to cease questioning immediately, except for questions designed to clarify the ambiguity. *See United States v. D'Antoni*, 856 F.2d 975, 980–81 (7th Cir.1988). Although this circuit has not had a recent opportunity to revisit the precise issue, the circuits and state supreme courts that have addressed the matter in the wake of the Supreme Court's decision in *Davis v. United States*, —— U.S. ——, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), have held that an ambiguous invocation of the right to remain silent does not require that the police cease all questioning. *See Medina v. Singletary*,

59 F.3d 1095, 1100 (11th Cir.1995) ("Law enforcement officers are not required to terminate an interrogation unless the invocation of the right to remain silent is unambiguous."); *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir.1995) ("We consider the defendant's statements as a whole to determine whether they indicate an unequivocal decision to invoke the right to remain silent.") (citing *United States v. Thompson*, 866 F.2d 268, 272 (8th Cir.1989)); *Minnesota v. Williams*, 535 N.W.2d 277, 285 (Minn.1995) (reasoning that the right to counsel is protected with a second layer of procedural protection, as mandated by *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and because fewer procedural safeguards attend to the right to remain silent, it follows that the Constitution does not require such a clarifying approach when an accused ambiguously or equivocally attempts to invoke his right to remain silent); *Vermont v. Bacon*, 658 A.2d 54 (Vt.1995) (holding that, without doubt, the holding in *Davis* applies to the right to remain silent), *cert. denied*, —— U.S. ——, 116 S.Ct. 117, 133 L.Ed.2d 67 (1995); *see also Evans v. Demosthenes*, 902 F.Supp. 1253 (D.Nev.1995) (predicting that Ninth Circuit will adopt same approach). Upon reflection, we have no reason to depart from the conclusion reached by these courts, although we believe that the matter requires a somewhat more plenary explanation.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court set forth a prophylactic rule for the protection of the Fifth Amendment right against self-incrimination. In terms now familiar to all members of the bench and bar, the Court held that, when a person in custody is interrogated, he must be informed of his right to remain silent and of his right to have counsel present during an interrogation. *Id.* at 444–45, 86 S.Ct. at 1612. In *Fare v. Michael C.*, 442 U.S. 707, 719, 99 S.Ct. 2560, 2568–69, 61 L.Ed.2d 197 (1979), the Supreme Court characterized "an accused's request for an attorney" as a "per se invocation of his Fifth Amendment rights, requiring that all interrogation cease." In *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981), the Court, quoting

this language from *Fare v. Michael C.*, held that a request for counsel requires that all attempts to interrogate the defendant cease. Against this backdrop, the Court later ruled in *Davis* that the *Edwards* rule—requiring the total cessation of all questioning—was not applicable when the defendant's request for counsel was ambiguous.[7] Rather, the Court further ruled that, in the face of an equivocal request for counsel, it is not necessary to cease all questioning. Indeed, the Court further stated that, although the use of clarifying questions would be a good practice, further interrogation need not be limited to such questions. *Davis* therefore makes it clear that it is only the unequivocal request for counsel, what *Fare* termed a "per se invocation" of the Fifth Amendment right, that requires all interrogation to cease. If an ambiguous request for counsel—a request that, if it were more clear, would amount to a per se invocation of Fifth Amendment rights—does not require the cessation of all questioning, we do not believe that *Davis* permits our imposing such a rule on any other ambiguous invocation of the right to silence. Thus, in light of the ambiguous nature of Mr. Mills' initial statement when presented with the waiver form, the investigating officers were not barred from questioning him later. Mr. Mills cannot challenge the admission of his statement on this basis.[8]

Mr. Mills makes an additional argument with respect to the statement introduced against him. He submits that the government never demonstrated that he voluntarily waived his *Miranda* rights. The magistrate judge found that Mr. Mills waived his *Miranda* rights orally, even though he never signed a written waiver. The magistrate judge did not determine that there was "an explicit waiver, in the sense of saying, I don't want to sign the form but I am willing to talk." Tr. 136. Rather, the magistrate judge determined that Mr. Mills' subsequent conduct indicated he validly waived his *Mi-*

*randa* rights. She noted that Mr. Mills had been read his rights twice and, according to his own testimony, understood them. Furthermore, Mr. Mills testified that he answered some of the officers' questions, but not others—a factor indicating that Mr. Mills was "in enough control of his circumstances to make his own choices about what he want[ed] to say and what he [did not] want to say." Tr. 139. In addition, the court found that Mr. Mills was an "intelligent person ... who is experienced in the criminal justice system." Tr. 138. On two prior occasions when Mr. Mills had been arrested and had not been Mirandized, he had refused to give a statement.

Whether a person in custody knowingly and voluntarily waives his *Miranda* rights depends upon the totality of the circumstances. *Fare v. Michael C.*, 442 U.S. 707, 724, 99 S.Ct. 2560, 2571, 61 L.Ed.2d 197 (1979); *United States v. Betts*, 16 F.3d 748, 763 (7th Cir.1994). A waiver does not need to be made expressly, but may be "inferred from the defendant's understanding of his rights coupled with a course of conduct reflecting his desire to give up his right to remain silent and have the counsel of an attorney." *Id.*; *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). In this case, Mr. Mills himself testified that he was read his *Miranda* rights twice and that he understood them. He also testified, upon questioning by the magistrate judge, that he answered some of the questions posed to him by the interviewing officers, but not others. We agree with the conclusion of the district court that Mr. Mills clearly understood his rights and understood that he did not have to respond to the officers' questions; indeed, he selectively chose not to answer some of the questions that were put to him. Furthermore, as the magistrate noted, Mr. Mills had prior experience with law enforcement officials, *see Betts*, 16 F.3d at 763, and had twice before

7. In *Davis*, the defendant had stated: "Maybe I should talk to a lawyer." *Davis*, —— U.S. at ——, 114 S.Ct. at 2353.

8. Pursuant to Circuit Rule 40(e), this opinion has been circulated to the members of the court in active service on the issue of whether the holding

in D'Antoni ought to remain the law of this circuit in light of the Supreme Court's decision in *Davis v. United States*, —— U.S. ——, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). No judge favored rehearing en banc.

exercised his right to remain silent—even without having been Mirandized.

In two respects, the evidence reveals that the interviewing officers, Officer Grapenthien in particular, sought to persuade Mr. Mills to cooperate with them. First, Officer Grapenthien made certain that Mr. Mills was aware that he was possibly facing a life sentence in prison. Second, it was suggested to Mr. Mills that his co-conspirators, by using the nickname "Big Dumbo," made fun of him behind his back. The district court, in accepting the report of the magistrate judge, determined that these two factors did not transform the interview into a coercive atmosphere. There was no evidence of trickery or deceit, and Mr. Mills demonstrated that he was aware of his rights and his actions. Given the applicable standard of review, we cannot substitute our judgment for that determination. We therefore find no error in the conclusion that Mr. Mills voluntarily waived his *Miranda* rights. The district court did not err by permitting Mr. Mills' statement to be admitted as evidence against him at trial.

3. *Use of the Mills Statement in Closing Argument*

The defendants, other than Mr. Mills, challenge the prosecution's use of the Mills statement during its closing argument. They submit that the prosecution wrongly used the evidence for substantive purposes against all of the defendants in a manner that exceeded the limited purpose for which it was admitted. Despite the limiting instruction given by the judge—that the evidence was admissible only against Mr. Mills—the defendants argue that the prosecution's closing argument implicated them. Because the statement of a nontestifying codefendant was used as evidence against them, they submit that the prosecution's argument violated the Confrontation Clause.

The right of an accused "to be confronted with the witnesses against him" includes the right to cross-examine witnesses. *Richardson v. Marsh*, 481 U.S. 200, 206, 107 S.Ct. 1702, 1706–07, 95 L.Ed.2d 176 (1987) (citing U.S. Const. amend. VI). When defendants are tried together, the pre-trial confession of one cannot be admitted against the other unless the confessing defendant takes the stand. *Id.* A defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). However, as the Supreme Court subsequently explained, its holding in *Bruton* was a "narrow exception" to the general principle that jurors follow their instructions. *Richardson*, 481 U.S. at 206–07, 107 S.Ct. at 1706–07 (citing *Francis v. Franklin*, 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 1976 n. 9, 85 L.Ed.2d 344 (1985)). The Court, explaining its earlier holding in *Bruton*, held that "a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." *Id.* at 207, 107 S.Ct. at 1707. The case before the Court in *Richardson* presented a significantly different situation, one in which the confession "was not incriminating on its face," but became so "only when linked with evidence introduced later at trial." *Id.* at 208, 107 S.Ct. at 1707. When the jury would have to link the facially nonincriminating statement with other evidence in order for the statement to become incriminating, the court reasoned that "it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence." *Id.*

In this case, we note first that the jury was instructed by the court, at the time that the Mills statement was introduced through Officer Grapenthien's testimony, to consider it as evidence only against Mr. Mills. The prosecution subsequently made reference to Grapenthien's testimony twice, once in its closing argument and once in rebuttal; at both references, the government specifically noted that the Mills statement was to be used against Mr. Mills alone. Then, during the court's instructions, the jury was once again admonished to consider

the statement made by Mr. Mills only against him. These instructions and admonishments give rise to the general presumption described in *Richardson* that a jury will follow its instructions.

▆▆ The prosecution's first reference was made in the context of discussing Mr. Mills' involvement within the conspiracy. As an illustration of Mr. Mills' activities, the prosecutor used Mr. Mills' post-arrest statement to describe how Mr. Mills collected and delivered money and supervised sales.[9] According to the defendants, these statements, particularly the references to how "they" were dealing crack in "35 packs" and how "this organization" worked, necessarily implicate them. However, these nonspecific references to other, nameless actors do not present the type of "facially incriminating" references that the Supreme Court found in *Bruton* to warrant a departure from the general presumption that juries follow their limiting instructions. "Simply put, there is no *Bruton* problem when the substitution ... does not identify the nonconfessing code-fendant by race, age, size, or any other means...." *United States v. Kreiser*, 15 F.3d 635, 639 (7th Cir.1994) (redacted statement referred to a drug "source"; no Confrontation Clause violation although only two co-conspirators at joint trial); *see also United States v. Chrismon*, 965 F.2d 1465, 1471–72 (7th Cir.1992) (no *Bruton* violation where statement "includes only a reference to a collective and thus incriminates a member of the group only when linked with other evidence").

▆▆ During the closing argument, the prosecutor also argued that the jury could rely upon Mr. Mills' statement that he had tossed a half kilogram of crack cocaine out the window of his car during a car chase on May 11. To support his argument that the incriminating statement was reliable, the prosecutor made reference to a phone call made by Mr. Banks on the day that Mr. Mills was arrested. In the phone call, Mr. Banks discussed with Ms. Boguille and Mr. Shipp the fate of the gym bag full of crack cocaine that Mr. Mills had with him.[10] The second

9. The prosecution's closing argument described the involvement of Mr. Mills in the conspiracy:

And you heard that after "Big O" [Mr. Mills] was arrested in this case he specifically gave a confession about his involvement in the crack cocaine operation from 1991 through 1993, and you can consider that confession against Mills in evaluating the evidence against him in this case.

He talked about how in this crack cocaine operation he had various jobs at different points. At one point he was a man who was out there collecting money from the street sellers. He would collect the money, which he referred to as 30 in his statement to Agent Grapenthien. He collected the 30 from the street sellers and he would deliver it back to the higher-ups in the organization. He transported as much as $6,000 at a time doing that.

...

He told Agent Grapenthien and Agent Grapenthien testified that he also at one point was in charge of the night shift in this crack cocaine operation. He was out there dealing with the sellers of cocaine from midnight until noon every day, out there on the night shift, dealing with the work; and he referred to work as the cocaine that they were dealing in the street. And they were dealing it, he said, in 35 packs, where they had a pack with 35 little rocks of cocaine in it.
Tr. 1009–10.

10. The recording was made on May 11, 1993, while Mr. Banks was incarcerated at the Metropolitan Correctional Center. The government argued to the jury that Mr. Shipp's reference to "sixty-first" indicated the police station to which Mr. Mills was taken following his arrest, located at 61st and Racine in Chicago.

BOGUILLE: Ah, you know, uhm, Big "O" had the candy, right?
...
BANKS: What Dumbo at?
SHIPP: Sixty-first.
...
BANKS: Uh ... the f—— is Dumbo doing there?
SHIPP: 'Cause Dumbo was you know what I'm saying.
BOGUILLE: Got candy.
SHIPP: Yeah. Taking that candy down there. But he's down there, you know what I'm saying because he was driving too crazy.
BANKS: Uh.
SHIPP: He say he, you know what I'm saying ... he ate the candy. See what I'm saying? He got rid of the candy. He didn't want no more. So you know what I'm saying? So I'm waiting for Dumbo to get out. So I can see what's up with the candy.
BANKS: Uh ... did you check on Dumbo?
SHIPP: Yeah. I went down there.
BANKS: He's charged with reckless driving?
SHIPP: Yeah. You know what I'm saying so he could lose it.
BANKS: Who got him? Blue and White?
SHIPP: Yeah.
...
I wanna know if I can get the candy 'cause he he the only one who know where the candy at so I can get it to the kids.

prosecutor in this case also made reference to the phone conversation. He argued that the discussion of whether Mr. Mills "had the candy" verified Officer Grapenthien's testimony concerning Mr. Mills' post-arrest interview.

The defendants submit that the prosecution used the Mills statement in conjunction with the May 11 phone call as evidence against the other defendants. We disagree with this characterization of the prosecution's argument. It is clear that the confession was used in a discussion of whether Mr. Mills was carrying cocaine with him when he was arrested in 1993. Rather than using the confession to implicate the other defendants, the prosecution was using the phone call to support the reliability of Mr. Mills' confession. See Tr. 1014 ("This call shows unequivocally that on that instance we know 'Big O' was involved in delivering cocaine, just as he had told Officer Grapenthien."). Because the statements made by the prosecution were not used as evidence against the codefendants, there is no violation of the Confrontation Clause. Even if we were to agree that the phone conversation and the Mills statement together established a contextual link that implicated the defendants, we cannot hold that it compels the conclusion that the jury did not follow the limiting instructions that it was given. *See Richardson*, 481 U.S. at 208, 107 S.Ct. at 1707–08.

### 4. *Ambiguity in Verdict*

Count I of the superseding indictment charged all of the defendants with participation in a multi-object conspiracy. Specifi-

G.Ex. Tr. MCC–1.

11. Specifically, the defendants argue in their joint brief that the form of the indictment leaves open two possibilities. First, the jury could have found the defendants guilty of one of the two objects of the conspiracy alleged in Count I: conspiracy to possess and distribute narcotics, a violation of § 841(a)(1); or conspiracy to use a communication facility (i.e., a telephone) to facilitate drug transactions, a violation of § 843(b). Within the first potential object of the conspiracy, the § 841 offense, the defendants argue that there is another possible ambiguity. The § 841 offense alleges that the defendants conspired to possess and to distribute two controlled substances: cocaine and cocaine base.

cally, the indictment alleged that the defendants conspired

> to possess with intent to distribute and to distribute in excess of 50 grams of mixtures containing cocaine base and multi-kilogram quantities of mixtures containing cocaine, Schedule II Narcotic Drug Controlled Substances, in violation of Title 21, United States Code, Section 841(a)(1); and knowingly and intentionally to use and cause to be used communication facilities, namely, telephones, in committing, causing and facilitating the commission of offenses in violation of Title 21, United States Code, Sections 841(a)(1) and 846, namely, the unlawful possession with intent to distribute and the unlawful distribution of cocaine base and cocaine, and attempting and conspiring to commit those offenses, which are felonies, in violation of Title 21, United States Code, Section 843(b).

R.84. The jury returned a general verdict of guilty on this count, convicting all of the defendants. The defendants submit that the language of the indictment, when combined with the general verdict, results in an ambiguity with respect to the objects of the conspiracy.[11] Without a special verdict, the defendants argue, the district court could not have known upon which object of the conspiracy the jury convicted the defendants. Without such knowledge, the district court erred in assuming that the jury found a conspiracy to distribute cocaine base—the most serious of the potential conspiratorial objectives—and thus erred in sentencing the defendants on the basis of that assumption.[12]

12. The defendants do not—and indeed could not—challenge their convictions on the basis of ambiguity in the indictment. In *Griffin v. United States*, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), the Supreme Court considered the challenge of a defendant who was convicted of a multi-object conspiracy. The jury had been instructed that it needed to reach agreement with respect to only one of the conspiratorial objectives in order to find her guilty of the conspiracy; it did and returned a general verdict of guilty on the conspiracy count. The defendant challenged her conviction on the basis that the evidence was insufficient to support one of the objects of the conspiracy. The Court held that due process did not require that the verdict be set aside; as long as the evidence supported a conviction on at least one of the objects of the conspiracy, the

Our review of the case law that has addressed this issue reveals that the form of the indictment often determines how a multi-object indictment may be utilized in sentencing. When an indictment is phrased in the disjunctive, as when a defendant is charged with conspiracy to distribute methamphetamine or amphetamine, it is generally held that a general verdict based upon the indictment is ambiguous. In *United States v. Owens*, 904 F.2d 411 (8th Cir.1990), for example, our colleagues in the Eighth Circuit considered an indictment that charged the defendant with conspiring to distribute "methamphetamine/amphetamine." The district court, following a general verdict from the jury, sentenced the defendant on the basis of methamphetamine—the drug with the more severe penalty. The Eighth Circuit determined that the use of the "/" symbol meant that the defendant had been charged and convicted of conspiracy to distribute either methamphetamine or amphetamine. This construction, held the court, rendered the jury's general verdict ambiguous; the jury was able to reach its verdict by finding the defendant guilty of conspiring to distribute either drug. *Id.* at 414. With this ambiguity, the court concluded, the district court could not know which of the two objects the jury found. Thus, the sentence based upon the methamphetamine was vacated. The court determined that it would withhold judgment on the defendant's conspiracy conviction for thirty days, giving the government the option of consenting to a new sentence based upon the amphetamine charge. If the government did not consent, the court held that the defendant's conviction would be vacated and it would remand the matter for a new trial. *Id.* at 415. This same result has been reached by other circuits that have considered an indictment phrased in the disjunctive. *See, e.g., United States v. Bush*, 70 F.3d 557 (10th Cir.1995) (defendant's indictment for distribution of "cocaine (powder) and/or cocaine base (crack)" held to be ambiguous), *cert. denied*, — U.S. —, 116 S.Ct. 795, 133 L.Ed.2d 743 (1996); *United States v. Garcia*, 37 F.3d 1359, 1370 (9th Cir.1994) ("*Garcia's* jury was charged with determining whether he was guilty of conspiring to commit the narcotics charges or whether he was guilty of conspiring to use communications facilities to facilitate the commission of drug offenses."), *cert. denied*, — U.S. —, 115 S.Ct. 1699, 131 L.Ed.2d 562 (1995); *United States v. Baker*, 16 F.3d 854 (8th Cir.1994) (verdict convicting defendant of violating 21 U.S.C. § 856 by making house available "for the purpose of distributing or using a controlled substance" held to be ambiguous and could not serve as basis for career offender sentencing); *United States v. Pace*, 981 F.2d 1123 (10th Cir.1992) (first object of conspiracy, possession with intent to distribute "methamphetamine/amphetamine," held to be ambiguous; sentence based on methamphetamine vacated for new trial or for resentencing based on amphetamine); *United States v. Quicksey*, 525 F.2d 337 (4th Cir.1975) (jury allowed to convict for either a general conspiracy or a narcotics conspiracy and not required to return a special verdict; sentenced based upon narcotics conspiracy vacated).

Other courts, such as the Fifth Circuit in *United States v. Bounds*, 985 F.2d 188 (5th Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 135, 126 L.Ed.2d 98 (1993), have been faced with a slightly different situation, in which the indictment was phrased in the conjunctive, yet a subsequent instruction presented to the jury the possibility of finding only one object necessary for a conviction. In *Bounds*, the indictment charged the defendant with conspiracy to manufacture "amphetamine and phenylacetone," but the jury was subsequently instructed that the conspiracy involved "phenylacetone or amphetamine." Under that circumstance, the Fifth Circuit determined that the jury instruction rendered the general verdict ambiguous. Thus, the defendant's sentence based upon the more serious of the two drugs could not stand. *Cf. United States v. Cooper*, 966 F.2d 936 (5th Cir.) (indictment alleged two objects of conspiracy in the conjunctive, but jury was instructed that only one object was necessary for a guilty verdict), *cert. denied*, 506 U.S. 980, 113 S.Ct. 481, 121 L.Ed.2d 386 (1992).

conviction would stand. *Id.* at 49, 112 S.Ct. at 469.

When the indictment is phrased in the conjunctive, however, courts generally have concluded that a general verdict does not result in ambiguity such as that found in *Owens* and the other cases discussed above. For example, in *United States v. Watts,* 950 F.2d 508 (8th Cir.1991), *cert. denied,* 503 U.S. 911, 112 S.Ct. 1276, 117 L.Ed.2d 502 (1992), the jury returned a general verdict convicting the defendants of conspiring to distribute "heroin, ... cocaine and cocaine base." *Id.* at 510. At the sentencing phase, the district court calculated the quantity of drugs attributable to each of the defendants by converting certain assets into an equivalent quantity of drugs, using as its conversion ratio $100 of assets for one gram of crack. The defendants pointed out that the indictment charged them with a conspiracy to distribute three different drugs and argued that the assumption that crack was involved in the conspiracy was unwarranted, given the jury's general verdict.

The *Watts* panel noted that, in *Owens,* it was presented with an indictment phrased in the disjunctive. In contrast, "[i]n the present case the indictment was an 'and,' not an 'or,' indictment. The jury did not need to decide between the different drugs." *Id.* at 515. Concluding that the evidence at trial supported the district court's use of crack cocaine in the asset conversion, the court held that, unlike in *Owens,* "the court in this case did not elicit an ambiguous or unclear verdict from the jury." *Id.* Other circuits addressing an indictment phrased in the conjunctive have arrived at the same conclusion as did the Eighth Circuit in *Watts. See, e.g., United States v. Linn,* 31 F.3d 987, 994 (10th Cir.1994) (defendant convicted of multiple-

object conspiracy, including "conspiracy to commit arson," but acquitted of substantive arson count; sentence based on arson conspiracy upheld "given the conjunctive nature of the conspiracy count"); *United States v. Peters,* 617 F.2d 503, 506 (7th Cir.1980) (per curiam) (holding that because the conspiracy count "does not refer to the five substantive offenses in the disjunctive, and since the jury convicted defendant of the offenses ... that were the objects of the alleged conspiracy, it is reasonable to conclude that the jury found defendant guilty of a conspiracy to commit all five of the substantive offenses"). *But see Newman v. United States,* 817 F.2d 635 (10th Cir.1987).[13]

The indictment in this case does not present the ambiguity found in *Owens* and the other cases discussed above. Rather, this indictment was phrased in the conjunctive, as was the indictment in *Watts:* The defendants were charged with a conspiracy to violate § 841(a)(1) (possession with intent to distribute and distribution of controlled substances) *and* § 843(b) (use of a communication facility) and, within the first of these two conspiratorial objects, the defendants were charged with possession with intent to distribute and distribution of cocaine base and cocaine. This construction clearly required the jury to find that both objectives and both drugs were involved in the conspiracy.

Furthermore, the court's instructions to the jury reiterated the conjunctive nature of the indictment. The court stated: "Count 1 of the indictment charges each of the defendants with conspiracy to knowingly and in-

13. In *Newman,* the defendant had been charged with a conspiracy involving both narcotic and nonnarcotic drugs, and the jury returned a general verdict of guilty. The district court sentenced him on the basis of the conspiracy to distribute narcotic drugs. Despite the conjunctive nature of the indictment, the Tenth Circuit determined that, because "the sentencing court cannot know for certain" the object of the conspiracy, both the sentence and the conviction were vacated. *Id.* at 637 (relying upon *United States v. Orozco–Prada,* 732 F.2d 1076 (2d Cir.), *cert. denied,* 469 U.S. 845, 105 S.Ct. 154, 155, 83 L.Ed.2d 92 (1984)).

*Newman,* however, presents a different factual situation from the one before us. The district

court in *Newman* had instructed the jurors that a guilty verdict could be returned on the conspiracy count if the jury found a violation of either one of the conspiratorial objectives. *Id.* at 638. In this case, no such instruction was given.

In addition, we note that the more recent decision of the Tenth Circuit in *Linn* does not appear to track the rationale of *Newman.* The defendant in *Linn* was convicted of a multi-object conspiracy framed in the conjunctive. His sentence, based upon one of the objects of the conspiracy (arson), was upheld "given the conjunctive nature of the conspiracy count." *Linn,* 31 F.3d at 995.

tentionally possess with the intent to distribute cocaine *and* cocaine base, *and* knowingly and intentionally using the telephone to facilitate the commission of the offenses involving trafficking in cocaine and cocaine base...." Tr. 1214–15 (emphasis added). The jury is presumed to follow its instructions, *United States v. Anderson,* 61 F.3d 1290, 1300 (7th Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 543, 133 L.Ed.2d 446 (1995), and we do not find a reason to depart from that presumption in this case. The jury could convict the defendants on the Count I conspiracy charge only by finding them guilty of the conspiracy that was described; as the instructions made clear, that conspiracy involved two objects and two drugs. The jury was never presented with the option of convicting the defendants of some other conspiracy involving different objectives.

Additionally, a review of the evidence presented in this case reveals that there was adequate evidence from which a jury could find that there existed a conspiracy to distribute crack cocaine, and the defendants do not challenge the sufficiency of the evidence on this point.[14] *See Bush,* 70 F.3d at 562–63 (concluding indictment's use of "cocaine (powder) and/or cocaine base (crack)" ambiguous, yet holding that the evidence supported a finding that cocaine base was object of conspiracy); *United States v. Dennis,* 786 F.2d 1029 (11th Cir.1986) (defendants convicted of conspiracy to distribute "controlled substances, including heroin, cocaine, marijuana, and talwin"; although instruction might permit the jury to return ambiguous verdict, evidence supported the conclusion that jury found a conspiracy to distribute cocaine or heroin).

To accept the defendants' argument, we would have to assume that the jury disregarded its instructions as well as the form of the indictment and chose instead to convict the defendants of membership in a conspiracy that was not charged, involving perhaps only one objective or only one drug. We cannot accept that assumption. Neither the form of the indictment nor the court's instructions created ambiguity in the general

verdict returned by the jury. The district court did not err in using a conviction for conspiracy to distribute crack cocaine in its sentencing determinations.

### B.

#### The Sentencing Proceedings

##### 1. *Quantity of Drugs Involved in Conspiracy*

The defendants challenge the quantity of drugs that the district court found attributable to the conspiracy and used in calculating the base offense levels for the defendants. The estimate adopted by the court, 20.5 kilograms of crack cocaine, was derived from Mr. Mills' post-arrest statement. The defendants submit that the Mills statement does not exhibit a sufficient degree of reliability and thus cannot serve as a basis from which to estimate the quantity of drugs involved in the conspiracy.

The estimate adopted by the court was taken from the Presentence Report, which in turn relied upon an estimate from the Government's Presentence Submission. The government, in its Submission, based its estimate of the total quantity of drugs involved upon the statement given by Mr. Mills following his arrest in September 1993. In that statement, Mr. Mills recounted his involvement with the conspiracy and described the quantities of drugs with which he dealt. Starting in the summer of 1992, Mr. Mills began to deliver the prepackaged crack cocaine to the locations at which it was to be sold. The report, based upon his post-arrest interview, stated that "he would usually take 5 to 10 packs (35 bags in each pack) at a time to the location where the sellers where [sic] selling. He said that he would usually do this 2 to 3 times a day, but on a good sales day he would do this five times a day." R.117. Based upon this statement, the government's Presentence Submission assumed, "conservatively," that Mr. Mills delivered an average of seven packs, each containing thirty-five bags of crack cocaine, twice a day from July 1992 through April 1993. Government's Presentence Submission at 34. If

---

14. *Ms. Boguille does, however, challenge the sufficiency of the evidence used to prove her involvement in the conspiracy. See Part II.A.1.b., supra.*

each pack contained 4.9 grams of crack cocaine,[15] then the Mills statement indicates that he delivered a total of 20,580 grams (20.5 kilos) of crack to the street dealers. This estimate, under United States Sentencing Guideline § 2D1.1(c)(1), resulted in a base offense level of 42.[16] *See* U.S.S.G. § 2D1.1(c)(1) (1993).

■■■ The quantity of drugs involved in a conspiracy must be established by a preponderance of the evidence, *United States v. Johnson*, 32 F.3d 265, 268 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1172, 130 L.Ed.2d 1125 (1995), and the evidence upon which a court is entitled to rely when making its sentencing determinations must have "sufficient indicia of reliability to support its probable accuracy." *United States v. Buggs*, 904 F.2d 1070, 1080 (7th Cir.1990). We review for clear error the sentencing court's determination, under the Sentencing Guidelines, of this quantity. *United States v. Berchiolly*, 67 F.3d 634, 639 (7th Cir.1995). We shall reverse the sentencing court's determination of the drug quantity only if we are left with a "definite and firm conviction that a mistake has been made." *Id.* (quoting *United States v. Corral–Ibarra*, 25 F.3d 430, 437 (7th Cir.1994)).

■■■ The defendants claim that the Mills statement, relied upon by the sentencing court, is inherently unreliable. Yet the district court accepted the testimony and found it to be a credible basis upon which to base its sentencing decisions. We cannot hold that this decision was clearly erroneous. The statement made by Mr. Mills was admitted into evidence at trial through the testimony of Officer Grapenthien, whose demeanor the court had the opportunity to observe. The court's decision to credit his testimony, and thus the content of the Mills statement, is not one which we find to be clearly erroneous. Furthermore, the 20.5 kilos found by the district court to be attributable to the conspiracy may actually be a conservative estimate when viewed in light of the evidence that was presented at trial. For example, the estimation of the drug quantity involved assumed that the conspiracy operated between July 1992 and April 1993, but the evidence at trial established that Mr. Banks began his initial purchases of cocaine powder in the fall of 1991 and that the conspiracy operated until as late as the summer of 1993. Additionally, the calculated amount does not include the half kilogram of crack cocaine that Mr. Mills threw from his car during the May 11 car chase. We thus hold that the district court's finding of 20.5 kilos is not based upon unreliable evidence, nor is it clearly erroneous.

### 2. *Foreseeability*

Mr. Dunlap, Mr. Wills, Mr. Gaines and Ms. Boguille each claim that the government failed to establish that the entire amount of crack cocaine involved in the conspiracy may be attributed to them.[17] They submit first

---

**15.** The Government's Presentence Submission estimated that each "pack" contained at least 4.9 grams of crack cocaine. This estimate came from the seizure of several bags of crack cocaine from the conspiracy during the course of the investigation. The quantity of crack cocaine contained in each individual bag ranged from .14 grams to .30 grams. The Presentence Submission assumed that all bags contained the lesser amount of .14 grams; thus a "pack," containing 35 bags, would amount to at least 4.9 grams of crack cocaine. Presentence Submission at 33–34.

**16.** The Government's Presentence Submission also put forth an alternative basis upon which to estimate the drug quantities involved. That alternative relied upon the trial testimony of Mr. Banks' two suppliers and the amount of cocaine powder they sold to Mr. Banks from March 1992 to April 1993. Converting this amount of powder cocaine into its equivalent amount of crack

cocaine, the government estimated that 49 kilograms of crack cocaine were involved in the conspiracy. Presentence Submission at 35–36. This alternative would have resulted in the same base offense level (42), but it was not adopted by the Probation Department's Presentence Report or by the district court.

**17.** Section 1B1.3(a)(1)(B) of the Sentencing Guidelines provides that "in the case of a jointly undertaken criminal activity ..., all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" are relevant to the determination of a defendant's base level offense. U.S.S.G. § 1B1.3(a)(1)(B). " '[R]easonable foreseeability' means more than subjective awareness on the part of the individual defendants.... Instead, conduct of co-conspirators ... can be considered "reasonably foreseeable" to a particular defendant if that defendant has demonstrated a sub-

that the district court failed to make specific findings as to the amount attributable to them. They also argue that, based on their limited involvement in the conspiracy, the entire 20.5 kilos involved in the conspiracy was not "reasonably foreseeable" by them.

The sentencing transcript reveals that the district court heard argument from the defense and the prosecution regarding the amount attributable to each of the four defendants. After hearing individually from each defense attorney and the prosecution's response, the district court overruled the defendants' objections on the foreseeability issue and held that, in each case, the full quantity of drugs was attributable to each of the four defendants.

 The district court's consideration of the defendants' challenges certainly cannot be characterized as "boilerplate." Rather, the sentencing transcript reveals that the court carefully considered each challenge that was brought to its attention and ruled upon it. It even invited further objections from the defendants in the event that something had been inadvertently missed. This inquiry was sufficient to satisfy the requirement of Federal Rule of Criminal Procedure 32 that, "[f]or each matter controverted, the court must make either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing." Fed.R.Crim.P. 32. We have held that, while "[e]xplicit findings are generally required [under Rule 32] . . . there are no 'magic words' a court must use; so long as it actually resolves the disputed issue on the record, a sentencing court fulfills the purposes of Rule 32." *United States v. Coonce*, 961 F.2d 1268, 1278 (7th Cir.1992). Furthermore, the court's adoption of the presentence reports was not erroneous; "a court may satisfy the requirements of Rule 32 by adopting the factual findings and calculations contained in a PSR, provided that those findings are based upon sufficiently reliable information." *United States v. Taylor*, 72 F.3d 533, 547 (7th Cir.1995). Neither the district

court's consideration of the defendants' objections nor the court's adoption of the presentence reports violated this standard.

 The defendants also challenge the sufficiency of the findings upon which their sentences were based. Our review of the evidence against each of them reveals no clear error in the district court's determination that the full quantity of drugs was reasonably foreseeable to each. *United States v. Mojica*, 984 F.2d 1426, 1445 (7th Cir.), *cert. denied*, 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993). The evidence revealed that Mr. Dunlap was involved in the conspiracy as a mid-level supervisor of the street sales of the conspiracy's crack cocaine. One witness testified that she turned over her daily proceeds from the street sales to Mr. Dunlap. Mr. Dunlap's girlfriend, Tosha Woods, testified that he went to "work" every day at the location at which the street sales took place. The investigation's surveillance of the area in which most of the sales took place showed Mr. Dunlap giving directions to the street-dealers during the day shift. The government also introduced several recorded telephone conversations in which Mr. Dunlap discussed his responsibilities as a day supervisor. This evidence supports the district court's finding that the entire amount of drugs involved in the conspiracy was reasonably foreseeable to him.

 With respect to Mr. Wills, the evidence also supports the district court's determination that the full 20.5 kilos of crack cocaine were reasonably foreseeable to him. Tosha Woods testified that during the summer of 1992, she observed Mr. Wills cooking crack cocaine at Mr. Banks' home. She also observed him bagging cocaine twice during that same summer. Telephone conversations recorded Mr. Wills discussing the street sales of crack cocaine with Mr. Banks and Mr. Shipp. Mr. Wills was also observed dropping off a brown paper bag at Mr. Banks' home. Additionally, he was caught in possession of ten bags of cocaine near the conspiracy's primary selling location. This evidence of Mr. Wills' involvement in the

stantial degree of commitment to the conspiracy's objectives, either through his words or his conduct.' " *United States v. Zarnes*, 33 F.3d 1454, 1474 (7th Cir.1994) (quoting *United States v. Edwards*, 945 F.2d 1387, 1393–94 (7th Cir. 1991)).

manufacture, packaging, and selling of the crack cocaine indicates that the full amount of the conspiracy was reasonably foreseeable to him.

We reach the same conclusion when we consider the evidence introduced against Mr. Gaines. He sold "dime bags" of crack cocaine in the area where the sales of the conspiracy took place. Several telephone conversations recorded Mr. Gaines talking to Mr. Shipp, Mr. Mills and Mr. Banks about the scheduling of the dealers, and the embezzlement of money from the conspiracy by Mr. Dunlap. Finally, videotaped surveillance showed Mr. Gaines counting out cash from daily sales near 77th and Union, the location of the conspiracy's sales. This evidence demonstrates a level of involvement in the conspiracy such that the full amount of the conspiracy would have been reasonably foreseeable to him. The district court did not err in its decision.

Finally, we hold that the evidence we reviewed when we considered Ms. Boguille's challenge to her conspiracy conviction also reveals that she was aware of the extent and scope of the conspiracy. The determination that the entire amount of the conspiracy is attributable to her is not clear error.

### 3. *Obstruction of Justice Enhancement*

Mr. Banks challenges the imposition of a two-level obstruction of justice enhancement on his sentence. See U.S.S.G. § 3C1.1. Even if we were to hold that this enhancement should not have been imposed, a reduction would leave Mr. Banks with an offense level of 46; with his criminal history category of III, a life sentence would still be mandated for him. Nonetheless, we hold that the imposition of the enhancement was not clearly erroneous.

While in custody on May 11, 1993, Mr. Banks made a phone call to Mr. Shipp and Ms. Boguille. In that conversation, Mr. Banks told Mr. Shipp to make sure that everybody "stayed in school." [18] In its closing argument, the government argued that Mr. Banks was telling Mr. Shipp to

> have everybody stay in line. I just got arrested here and I'm in big trouble, so don't have everybody shooting their mouth off about our operation. Have them stay in school, have them tow the line. Don't have everybody shooting their mouth off.

Tr. 1013. Sometime following this conversation, Mr. Shipp had a conversation with Trina Rankin, a street-level dealer who testified pursuant to a grant of immunity. According to Ms. Rankin, Mr. Shipp asked her if she had talked to "those people." Tr. 546. She answered no, and he told her not to say anything to them. While speaking to her, he had one hand on the back of her neck. She testified that she understood Mr. Shipp to be telling her not to talk to the FBI; she also stated that he was laughing as he talked to her and that she did not take the matter seriously.

The United States Sentencing Guidelines permit a two-level increase in a defendant's offense level "if the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense...." U.S.S.G. § 3C1.1. The Application Notes to this Guideline supply a "non-exhaustive list of examples of the types of conduct" to which the enhancement may apply; the list includes "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so[.]" U.S.S.G. § 3C1.1, comment. (n.3(a)). The government's theory is that Mr. Bank's comment, ordering Mr. Shipp to make sure that the "kids stay[ ] in school," resulted in Mr. Shipp warning Ms. Rankin not to talk to law enforcement officials. Mr. Banks argues that because Ms. Rankin did not subjectively understand Mr. Shipp to be

---

**18.** The government referred to the following excerpt from that phone call:
BANKS: Everybody got to stay going to school and doing what they gotta do. Don't nobody fail school....
SHIPP: Don't nobody fail school just because the courses is getting harder....
BANKS: Right....
SHIPP: You have to stay there, you know what I'm saying and hack it.
BANKS: That's right....
G.Ex. Tr. MCC–1.

threatening or intimidating her, his comments do not warrant the enhancement.

Because the sentencing court's determination that a defendant obstructed justice under § 3C1.1 is a finding of fact, we review that decision under the clearly erroneous standard. *United States v. Garcia,* 69 F.3d 810, 815 (7th Cir.1995). The district court's determination—that Mr. Banks' comments amounted to an instruction that others should not cooperate with law enforcement—is not clearly erroneous. The impact of Mr. Banks' instruction upon Ms. Rankin is irrelevant; the enhancement may be imposed even if a mere attempt had been made to obstruct or impede an investigation by law enforcement. U.S.S.G. § 3C1.1. Because Mr. Banks' comments may reasonably be understood as an instruction to others to keep quiet, the enhancement must be upheld.

### 4. *Constitutional Challenges*

The defendants advance a number of constitutional challenges to the procedures used in their sentencing and the sentencing guidelines. Each of their challenges has been reviewed by this court on prior occasions. The defendants do not present compelling reasons for overturning this circuit's precedent and departing from the doctrine of stare decisis. *See United States v. Francis,* 39 F.3d 803, 810 (7th Cir.1994) (sentencing hearing does not determine guilt and is not a "criminal prosecution"; thus, the Sixth Amendment Confrontation Clause is inapplicable); *United States v. Porter,* 23 F.3d 1274, 1277 (7th Cir.1994) (preponderance of evidence standard adequate for sentencing phase); *United States v. Johnson,* 32 F.3d 265, 268 (7th Cir.1994) (quantity of drugs purely a "sentencing issue"; does not need to be proven by clear and convincing evidence); *United States v. Salinas,* 62 F.3d 855, 859 (7th Cir.1995) (hearsay evidence relied upon at sentencing need only be supported by "sufficient indicia of reliability"); *United States v. Chandler,* 996 F.2d 917, 918 (7th Cir.1993) (no discriminatory intent on part of Congress in enacting the 100:1 ratio of cocaine powder to cocaine base, thus no violation of equal protection clause); *United States v. Lawrence,* 951 F.2d 751, 755 (7th Cir.1991) (ratio rationally related to dangerousness of drug; no violation of due process clause); *United States v. Smith,* 34 F.3d 514, 525 (7th Cir.1994) (ratio does not violate prohibition against cruel and unusual punishment); *United States v. Blanding,* 53 F.3d 773, 776 (7th Cir.1995) (term "cocaine base" is unambiguous; rule of lenity thus inapplicable).

### Conclusion

For the reasons set forth in the above opinion, the judgment of the district court is affirmed.

AFFIRMED.